Good morning, your honors. My name is Claire Chung, and along with my co-counsel, Alex Rodriguez, I represent the appellant, Mr. Andre Patterson, in this matter. Mr. Patterson was arrested by the ATF agents in a fake stash house sting operation on December 15, 2011. After he made his initial appearance on January 18, 2012, Mr. Patterson spent almost four years in jail before his trial finally commenced on September 1, 2015. Mr. Patterson's right to a speedy trial was violated because the number of non-excludable days in his case is 262. On September 14, 2012, the District Court first found that Mr. Patterson was incompetent and therefore committed him to the custody of the Attorney General for hospitalization. Is there any disagreement that he was incompetent, at least for more than, what, 100 days at that time? No, your honor. However, since this order, the government simply left Mr. Patterson idly in jail for 194 days before finally moving him to FMC Butner for treatment. But in attacking the long delay while Mr. Patterson was awaiting transfer to Butner, are you arguing that he was not actually incompetent during that time or a part of it? Your honor, I'm not arguing that he was not incompetent. However, under section 3161H1F, the language of the statute clearly provides that any time in excess of 10 days in transporting a defendant to and from places of treatment or hospitalization is presumptively unreasonable and should be included in the speedy trial calculation. Yeah, but look, beyond Patterson's 2013 motion to dismiss, what is the evidence that Patterson was vigorously demanding trial? Now, other than questioning the slow pace of his move from the state facility in Kentucky to Butner, what did Patterson do to signal he was anxious to get to trial? Because he did request or acquiesce in all 11 continuances. Your honor, it is true that Mr. Patterson filed many of the continuances. However, after the court order in September 2012, Mr. Patterson's defense counsel brought to the attention of the district court and the government on three occasions, stating that Mr. Patterson had not been moved and there was nothing done in relation to his competency proceeding during that time. And therefore, by raising the issues repeatedly before the court, defense counsel was essentially saying that this delay violated Mr. Patterson's right to a speedy trial. And apart from the motion to dismiss on November 14, 2013, Mr. Patterson filed another motion to dismiss for a speedy trial violation on July 31, 2015. Now, if medical staff are to blame for certain delays, are those delays automatically chargeable to the government? No, your honor. Mr. Patterson, those delays does not ultimately should be charged to the government. However, Mr. Patterson himself was not responsible for the delay. The incompetence of the medical staff who evaluated Mr. Patterson did slow down his commencement of his trial. And in regards to the Sixth Amendment analysis, Mr. Patterson should not be charged for the delay caused by the medical staff at FMC Bartner. What was the prejudice, counsel? Were there witnesses that died in the interim? What have you shown as a result of that delay that is problematic here? Your honor, there is a presumption of impairment to Mr. Patterson's defense because in this case of almost four years that have passed between the time of his indictment and his trial, the evidence against Mr. Patterson in this case mainly rested on the testimony of the six law enforcement officials and a videotape. In fact, only two of the witnesses testified in relation to the video. As to what happened outside that one meeting, the details were left to the testimony of the witnesses. And given the passage of a long time, the presumption of fading memory is not rebutted. And in United States v. Doggett, the Supreme Court has said that a defendant is not required to offer affirmative proof for particularized prejudice in every speedy trial violation. And especially in terms of impairment to defense, the Supreme Court in Barker v. Winkle had stated that this prejudice will be the most difficult to prove because what has been forgotten can rarely be shown. And moreover, the 194 days should be charged to the government. And so that would bring the speedy trial calculation to over 70 days. And in this case, Mr. Patterson did affirmatively assert at least twice that his right was... But he was incompetent to stand trial during that time. Incompetent. Yes, Your Honor. However... He wouldn't have been standing trial regardless. However, the fact that he was simply left in jail and doing nothing for six months, this period of delay should be charged to the government because subsection H1F specifically said so. And when Congress imposed a 10-day limit on transportation, Congress clearly intended to prevent the government from trampling a defendant's right to a speedy trial by unnecessarily delaying the transportation... And so you believe that the fact that he couldn't have been tried in any case doesn't factor into this? Sorry, I didn't understand your question. Well, he could not have been tried. He's incompetent. Yes. How do you think that factors in? It is true that he was incompetent during this period. However, Mr. Patterson should not be blamed for this unjustifiable delay under the Sixth Amendment analysis. Well, it's not a matter of him blaming. It's a matter of him being blamed. It's a matter of him doing the blaming, isn't it? Your Honor, the Sixth Amendment is a balance of the factors, and as for the second Barker factor, the government's negligence in this case clearly contributed to the delay of his trial and thereby creating prejudice to Mr. Patterson. Your Honor, for the foregoing reasons, we ask this Court to dismiss the charges without prejudice. Thank you, Ms. Tang. Mr. Rodriguez. Good morning, Your Honors. May it please the Court... Okay, forgive me for a minute. Okay. May it please the Court, Alex Rodriguez... Don't be fearful. Andre Patterson. Your Honors, based on the facts and video evidence, it's clear that it was not reasonably foreseeable to Mr. Patterson that 20 kilograms of cocaine was intended for the robbery in this case. The reasonable foreseeability standard requires an objective test, and although Mr. Patterson concedes that he committed to this crime, he was committed to this crime, the video evidence, it never shows or demonstrates that Mr. Patterson was committed to greater than an amount of 10 kilograms of cocaine. The government in this particular case... Was he even really committed to the cocaine at all? His commitment was more toward the cash, wasn't it? Yes, Your Honor, that's exactly correct. His commitment was the conversation in the entire meeting from the mark that he gets in there at about the 25-minute mark to the very end of the video footage, the evidence, shows that he is committed to two things. His focus is on cash, which is what he was under the impression that the crime was for, as well as this is the alleged Mexican drug cartel armed guards, the hidden gunmen, this mystery man that he has shifted the conversation to. The undercover agent as well shifts this discussion to this point, and that is the entire discussion of the meeting revolves around armed guards and hidden gunmen and puffery, essentially, to assert his status that he's up to this task. Is there any reason it would not be acceptable for us to presume that he was listening to the conversations taking place around him at the planning meeting, even if he was not actively commenting when certain quantities were being discussed? Yes, Your Honor. Based on his body responses, his body language, his lack of responses, there's nothing concrete or definitive to point that he was actively engaged or tracking as to the gravity of the situation or the gravity of the conversation. In fact, point in fact, the one time that he does ask the direct question of how much did you pick up last time at the $37.59 mark on the video, the undercover responds $10.00, and prior to that, the undercover says $6.00. Then later on, a few minutes later, the undercover again for a third iteration says $10.00. The conversation briefly drifts towards the amount of $20.00, but then for the rest of the video, the rest of the evidence, it shows the conversation skips around to armed guards. But there were mentions, were there not, of the possibility of 20 kilograms of cocaine with him present? There was one at the 40-minute mark, and then there was another that was hypothetically brought up by a co-conspirator, Mr. English. But Mr. Patterson specifically never actively engaged in that part of the conversation, nor did he appear to understand. In fact, at certain points, he drifted to conversations of the Lord had sent me here to do this to guide you into the future, which was symptomatic of something that he was later diagnosed for delusional disorder from four separate licensed physicians. Well, that was something I was going to ask about the cash even that he kept mentioning. The other two, the English and the undercover, both were saying there's no cash back there. He just insisted there was cash, right? Yes, Your Honor. The conversation gets to the point where the undercover, it's almost as if Mr. Patterson is not taking the bait or the proverbial carrot on the stick, which is part of the ruse and the tactic that this particular tactic calls for. And it goes to the point where the undercover almost becomes exasperated that there is no cash there, that that's not part of the plan. It appears that, for lack of better word, Mr. Patterson is on the same page with the rest of the party members. And in fact, it appears that he just, he even states, I want that cash, not the dope. Did Patterson's counsel ever elicit a cross-examination that there were numerous other meetings at which Patterson was not present? Does the record tell us, you know, why he wasn't at those meetings? It does not to, I do not remember that it does, Your Honor, but I do know that he was there on the second meeting, which is one of five meetings. He wasn't there before, he wasn't there after, and Mr. English was. And Mr. English was the individual that hypothesized the 20 kilograms of cocaine, where Mr. Patterson is focused on, excuse me, less than 10 or 10. At no point does the government ever establish that there's more than 10. The mere brief mention, a floating conjecture by the undercover agent, simply just does not establish that there was an agreed upon amount. And this is what breaks this case away from so many other cases, U.S. v. Kendall, McKenzie, Barber, all these other similar cases where there's an agreed upon amount and there's consistent meetings, two, three, four meetings where they talk about 20 or 30 kilograms. In this case, we're nowhere near that point. Interestingly and curiously, the undercover pulls back somewhere between the 40-minute mark and the hour mark by saying, well, I'm not sure, I may have to sleep on it, indicating that either A, he wants them to believe this is bigger than it actually is, or B, that they're just simply not taking the bait and wants to maybe involve more people if he can get them to come later on. But ultimately, this is a case that drives the point home with the serious problem and the controversy of this case. It's ripe for abuse and error and bad precedence. Keep your eye on your line. Yes, Your Honor. So in closing, we would respectfully request a reverse and remand for resentencing. Thank you. Okay. Mr. Reitz. May it please the Court, Brian Reitz for the government. I'd like to start with the speedy trial issue, then move on to the sentencing issues. That's the way it came up. I think we've heard a lot in the Speedy Trial Act about the interplay between H1A and H1F, which the government would agree is an interesting question. However, it's not relevant to this case because H4 controls at any point in time when a defendant is incompetent, and we've heard today that defendant was incompetent over this bulk of time. So if you look, he was adjudicated or found incompetent September 14, 2012, and at least was incompetent until October 9, 2014, which encompasses 178 days. So any delay or alleged delay about the treatment or transportation is irrelevant because H4 controls that, and there is, as Judge Rovner pointed out, there's no possibility that he could be tried at that point in time. So there's no reason for this Court to even get to the H1A versus H1F interplay, which the circuits have split on that. But H4 controls this case and says any time when a defendant is incompetent, that time is excludable automatically. That's what the district court found in both of its orders denying the dismissal, which are docket 203 and 323. But why did it take so long to move Patterson from the state facility in Kentucky to Butner, which is also in Kentucky? Simply asserting that entire period is excludable because he was incompetent to stay in trial at that point sort of turns the inquiry on its head if a quicker transfer would have expedited his treatment and ability to stay in trial. Your Honor, I think that concern is raisable in the Sixth Amendment context, but it's not raisable in the Speedy Trial Act context. And the government has agreed that under one of the Barker factors, at least a little bit of the delay is caused by the government. I mean, there was delay in there. Now, some of that delay, again, was because Mr. Patterson refuses treatment, and there is no bad faith. But that being said, the other Barker factors, if you look at even within that Barker factor about who caused the delay, incompetence has to be a major factor there as well. And as you mentioned in the opening part of this argument, Mr. Patterson requested 11 continuance motions. So it's difficult for him to claim that he was being denied his right to trial when he was not filing motions for a speedy trial, but filing continuances to delay the trial himself. And as far as the motions to dismiss, he didn't file one until two years, and the next one was a year and a half later. So, again, I mean, to step back, the government would agree that some of the delay is a factor. It's just not and cannot be a factor in the Speedy Trial Act. It only is a factor in one of the Barker Sixth Amendment context factors. But the delay, even if the delay is split, the government, as the district court found, is more weighted towards Mr. Patterson. His lack of finding or requesting his right. And then there's really been no credible allegation of prejudice. Well, excuse me, Counsel, wasn't there some delay not only based on the transport, but the delay based on the long time the medical professional took to get the report done? Wasn't that some of that? Well, so I think that clearly is encompassed by H1A. That's not delay in transportation when H1F might come into effect. Any time for a medical proceeding is counted under H1A, under the back. Now, moving on to the Sixth Amendment, even if this was a delay, I think it's difficult to say it was a delay that someone didn't sign the diagnosis quick enough. I know that I write briefs and don't automatically file them. I like to take a step back sometimes. Well, wait a minute. Doing briefs and comparing that to a medical diagnosis or report, that's a little bit different. You should want to get to that as soon as possible, shouldn't you, to make a determination on what that person's medical symptoms are? Certainly, but I think that reflecting, seeing how Mr. Patterson changed in that time period, very well might have been a diagnostic tool. Even still, again, under the Act, H1A exempts any time that's for proceeding. The only time we can discuss reasonableness is transportation. So there's no reasonableness overarching concern when it comes to medical proceedings. Well, sure we can discuss reasonableness. Why was he moved around so much? I think, again, you can in the Sixth Amendment context, but not the Speedy Trial Act context. So if the court wanted to say that delay somewhat counted against the government in the Sixth Amendment context, I think that would be acceptable. The problem is even within that barker prong, you have defendants' 11 continuance motions. And the bulk of the time, we're talking about a month or so, Mr. Patterson was incompetent for, I mean, well over, at minimum, over a year. So the bulk of the delay still would be Mr. Patterson. And, again, there's a chunk in there where he sought an interlocutory appeal, which of course is his right to do, but he can't come back to the district court and claim that time for being chargeable to the government. So even in that delay in the Sixth Amendment context, you only have, that's a small portion of the delay that could be chargeable to the government. And then he would- Finish your thought and then we move on. Well, I was going to transition to the other barker factors. Yeah, well, I want to transition to whether there was any evidence that the members of the conspiracy were reporting back to Patterson on the content of the meetings that took place without him. Well, Your Honor, they certainly had to at least one time, because after the meeting adjourned, they were then reconvened at the day they were going to commit the robbery and Mr. Patterson was there. He was arrested with them, with all the other conspirators, at the time and place where they were planning to start the robbery from. That doesn't mean that they told him 20 kilos, though, does it? Well, the 20 kilos is clearly expressed in the conversation where Mr. Patterson was at. There is no reason to suspect- When you say clearly, counsel, there was a 6 to 10 reference at first, right, 6 to 10 kilos. Then the U.S. said 10 kilos that he got himself, and it looked like there may have been something equal to that. Then he said 20. There may be more. It was a lot. Then English said something about 20, but it was an amount that was all speculative. It was all even during that conversation. It was speculative anyway, but during that conversation. So I guess how do you distinguish or how does McKenzie- It's different with McKenzie here, isn't it? McKenzie, it was mentioned 20 was the only number mentioned. It was mentioned multiple times. Why wouldn't we just split the amount or average it out for 10 as to what you're going to impute to someone's knowledge? Let me answer the factual, then I'll move on to both the standard review and a stipulation that Mr. Patterson made. So factually, yes, the officer said he usually delivered 10. So the 20 was never how many he delivered. He said there was usually at least that much on a table, and then he said there could be 20, and there might be more in the back room. So there was at least- There could be and there might be. Yes, certainly. I mean, we're in, again, the land of speculation. We agree. But 20 was a mooted amount by two of the parties there, English and the undercover agent. So two of the four people there specifically discussed 20. English discussed 20 in the context of how much money that was and the fact that there would be that much cocaine. The people there would shoot to protect it, so they made contingency plans for that. And I would add to that- Let me ask you this. Do you think that they wouldn't have had shooting with 10 versus 20? Is that what you're trying to say? I don't doubt they would have, but English specifically pointed out 20 as a reason that they had to be extra prepared because of that amount. So it wasn't just the undercover agent that mooted that amount. One of the conspirators did as well, and Patterson was there and listening. Now, I'd like to move on to the standard review and stipulation. So it's hard to say the district court erred, considering the parties actually entered a stipulation telling the jury how many 20- or that 20 kilograms of cocaine was a dealer amount and not a user amount. So this, I think, was a part of the reason there was no objection is because all the parties agreed that there was an agreement for 20 kilograms. Now, I think, again, we have to step back. This is plain error review. There was no objection. So first of all, we have a weighing of evidence by the district court. I think it's difficult to say that any district court has clearly erred finding that 20 kilograms, which was discussed by the parties, wasn't the number that they had discussed for the robbery. It certainly is difficult to say that that questions the integrity of the judicial system. I mean, if the district court would have said 50 or 100, maybe that would question the integrity of the judicial system. But 20 was- Well, Mr. Reitz, look, the drug quantity determination is a real problem with these fictitious stash house cases. I mean, what's the limit on the government? mentioning any quantity of cocaine that they feel like, you know, in order to ratchet up the future defendant's sentence based on nothing more than the whim of the agent involved. We agree, and I think if I could take a step back and answer that institutionally, we have tried to be responsive to this court's concerns and criticism of the fictitious stash house cases. We actually do not, my understanding is we do not take them anymore. This case, however, so two points on that. This case is residual. It derives from a 2011, which is before this court really criticized the stash house cases. It's only here at this point in time because Mr. Patterson's incompetence. Otherwise, it would have predated that. So we agree with that concern. Let's go to Mr. Patterson's incompetence because the way he spoke at this meeting, both of the other two people at the meeting were looking at him like, what is wrong with you? There is no cash here, and that's all he talked about. So from that point, we knew there was something off here. And then to say, well, he had to know affirmatively that there was 20 that was the agreement, it's sort of like you're trying to have it both ways. I don't think the case law is he had to know affirmatively. He had to have a reasonable probability to believe, and he did because the 20 was discussed there. Now, that he wanted money, I think it should be unsurprising that he wanted money because the reason you rob drugs is to sell them to get money. I'm talking about the reaction of the other two people in the room, including the UA to him, when they were telling him affirmatively there's no cash in the back of the room, and he asserted that there wasn't. That's what he wanted. Yeah, he wanted there to be cash there. I don't think that's even surprising for any people. We often wish things to be true on the hope that they will be. That doesn't mean that he couldn't enter the agreement. There's been also no real argument that he couldn't. I'm sorry. I really want to turn back to the institutional point on the second that I wanted to make. The broad concern in the fictitious stash house cases is the government agents will go to people that maybe don't have a proclivity to do this and kind of egg them on. That's going to be my question, and I'm sorry to interrupt you, but in terms of finding the 20 kilograms reasonably foreseeable to Patterson, was there evidence that he had ever before distributed cocaine or that he had some mechanism in place to sell it? So my answer was going to get to that, so I will get to that. Just give me a couple sentences before I directly answer. So this was not the sort of entrapment that this court is concerned about. This was a standing robbery crew. This crew was already robbing people in Bloomington for this. The police infiltrated it. That's the reason we have this fictitious stash house. This was not a created crime. This was the police being reactive to try to prevent this from happening. So we know they found out that English was maybe the leader of this gang. They didn't know the other people. So when they set up this meeting, English contacted Patterson, and he said, This is my guy. We're professionals. This is who I trust to go in and to do it. So I think there is certainly evidence from that that we can imply that the reason English sought out Patterson and then said, We're professionals. This is the guy I trust, is because they had done this before. Now, moving on, Mr. Patterson did make plans to sell or to stash the cocaine once he stole it. That's Supplemental Appendix 31. So while he was agreed, focused more on the money, he discussed what he would do with the cocaine once it was stolen. So there is reason to suspect that, one, Patterson had already done this, was a member of this crew that was terrorizing the local community, and then reason to suspect that he believed there would be cocaine there. The 20 kilos is in the record. There is no clear error for that. There certainly was not plain error for a standing robbery crew to discuss what they were going to rob, and the parties agree. I mean, maybe this isn't a contract where it's written down, but we can't really expect that. We can't really expect every single party of a conspiracy to say every single part. But Mr. Patterson was there. He heard the 20 kilograms mooted, and that was enough to survive plain error review, certainly. Before you go, I have this one sort of curious question. How many charges were there, and what was he acquitted of? Well, a total of 15. He was charged with five things. He was acquitted of gun charge and furtherance of drug trafficking. He was charged for conspiracy or attempt to possess the cocaine. Say that again. A conspiracy or attempt to possess the cocaine, and then conspiracy to commit robbery. And then he was convicted of conspiracy to possess the drugs to distribute them, and then the felon in possession of a firearm, which his fingerprint was on the gun. Because I was quite curious about that, because when he wasn't there, for instance, something going on, I just wondered if that was part of what he was acquitted of. Did the jury take that into consideration and say, well, because he wasn't there? I think it's very possible. I mean, he was tried by himself, but I think it's very possible that they were a little concerned that he was maybe not the lead person, and that's the reason the jury only convicted him to the five counts, which I think also cuts against his prejudice claim or his prosecutorial misconduct claim that the jury here was functioning. So, I mean, I don't exactly know why the jury did that. Frankly, I think there were sufficient evidence. I don't know why, but I mean, because we have a lot of curiosity about what was going on while he was in meetings that he did not attend, that's all. Yeah, I think it's reasonable to believe the jury was skeptical that he agreed to all of this stuff, and that's why they convicted him of just the conspiracy to distribute the drug count. And, of course, the felony possession, which his fingerprint was on the gun. Thank you. Thank you. How much time does Ms. Chang have left? Four minutes. Well, give her three. Thank you, Your Honor. Your Honor, Section H-4 does not claim H-1F because H-1F specifically used the language to and from places of examination or hospitalization. The word hospitalization indicates that Congress has clearly contemplated the period of time after a defendant is found incompetent and has to be hospitalized to receive treatment. Furthermore, the district court order has said that Mr. Patterson should receive treatment. However, during the two years and nine months, Mr. Patterson had not received any kind of treatment, and a year after the cell hearing, the doctor just found him miraculously restored to competency without him taking any medication. It is true that Mr. Patterson refused to take medication. However, a defendant should not be forced to waive his right to a speedy trial simply because he was exercising his constitutional right against involuntary medication. Thank you, Your Honor. Thank you. How much? Give him another minute as well. Thank you, Your Honor. First and foremost, there's no evidence that Mr. Patterson was ever part of any robbery crew. And to the second point about the comment about being professionals with regards to Mr. English and Mr. Patterson, we would attribute that to mere puffery to show that he was up for this task. In this particular case, we're not arguing about entrapment. And to your point that you brought up earlier about how outrageous it would be and how far you could go with 50 to 100 kilograms of cocaine, the limit is unforeseeable at this point. It's not what's possibly foreseeable. It's what's reasonably foreseeable. And in this particular case, it's curious that the government consistently places it at 20, which just so happens to break the threshold of 15 kilograms, which elevates the sentence that much higher. So what amount would you put it at? I'm sorry, Your Honor? So what amount would you put the conspiracy? I would put it at what the parties agreed to from which they could come up with a reasonable estimate. Are you saying that he agreed to 10 or he was definitely more present and a part of that conversation? I would say, Your Honor, that based on his presence of mind at that point in the video evidence, that he was aware of no more than 10 because of what was discussed. When he asked the direct question, how much did you pick up last time, and the undercover said 10, and previous to that he said 6, and then a third time the undercover says 10, that is what, based off of his body language and his responses, that's what Mr. Patterson could go off of at that point. And the fact that, as we mentioned earlier throughout this meeting, that his focus was on guns and defending himself and protecting himself as well as stealing money, robbing money. And it was English, not Patterson, who was basing these hypotheticals of possibilities of greater than amount, but they were mere hypotheticals. What we're arguing here is that Mr. Patterson or what we're discussing is what is attributable to Mr. Patterson, what he believed, what he was aware of. And based off of the video evidence, which is what the government is arguing, you can't attribute anything more than that by arbitrarily placing an amount greater than 15 just to do so. As mentioned before, it just sets a bad precedence because it's what's reasonably foreseeable. There was no consistent agreement similar to McKenzie where, on three different meetings, they talked about 20 to 30 kilograms of cocaine. And just before the robbery, the undercover turns to the co-defendants, co-conspirators, and asks them, do you understand we're going to go rob this place for 20 to 30 kilograms of cocaine? That was completely different from this particular case where Mr. Patterson was involved in just one meeting with ambiguous conversation that hopped around from armed guards and hidden gunmen and how much cash was going to be stolen. For those reasons, it just doesn't rise to the level from which Mr. Patterson specifically could have reasonably foreseen more than 10 kilograms of cocaine based on the evidence. Thank you. Thank you, Your Honor. Now, I want to thank Ms. Chang and Mr. Rodriguez. Are you seniors? Yes, we are. We're law students. And tell everyone what law school. Well, you certainly are going to make wonderful lawyers. And I want to congratulate Ms. Christensen. You are so fortunate to be under her tutelage. So the Court thanks you very, very much for the aid that you have given us. And the Court also always thanks the government because it has to. No, the Court thanks the government.